STATE OF TENNESSEE *vs.* JAMES E. RUST and others.

October Term, 1874.

CONTEMPT OF COURT BY VIOLATING AN INJUNCTION.—Where two of the defendants had violated an injunction by using funds contrary to its inhibition, but principally to pay off encumbrances on realty assigned in trust to secure the demand for which the funds were impounded, and the solicitor of the creditors had sanctioned the use of a portion of the funds for that purpose, and neither the extent of the actual loss nor the ability of the defendants to make it good appeared, the court declined, before final hearing, to extend the punishment beyond the limits prescribed by the Code, § 4107.

THE CHANCELLOR:—Bill filed 18th of July, 1871, against Rust, as late treasurer of the state, and his official sureties, and the People's Bank, to have an account between the state and Rust, as treasurer, and in the meantime to secure the possession of certain coupons, as the property of the state, alleged to have been deposited by Rust with the defendant Ogden, or with the People's Bank, of which Ogden was the president and one of the stockholders. On the same day a fiat was obtained from Judge Guild directing the clerk to "issue the ordinary injunction and

attachment as prayed for." An injunction was issued, but no attachment. The case comes before me now upon the petition of the state, filed on the 5th of July, 1874, alleging " that, in defiance and disregard of said order or writ, said Rust afterwards used and appropriated a large amount of said coupons  *   *   *  with the knowledge and consent of said James G. Ogden, in whose charge they at first were." The defendants Rust and Ogden are now on bail, under an attachment ordered by the Chancellor upon this petition, supported by affidavit.

The facts are that Rust was elected treasurer of the state on the 20th of November, 1868, and, having given bond as required by law, entered upon the discharge of his duties. An effort was made by one of his sureties to be released, and a new official bond seems to have been given, but the facts in this regard are not material to the present issue. After his retirement from office Rust had a settlement with a committee of both houses of the general assembly, about the 2d of February, 1871, in which he was found indebted to the state in the sum of $61,398.21. The correctness of this balance was not, and is not, disputed by Rust, who insisted, however, that he was entitled to pay it in coupons of bonds of the state of Tennessee, which he claimed had come to his hands in the discharge of his duties as treasurer, and he made a tender of these coupons, to the full amount of the balance found, to the legislative committee, which they refused to receive. The bill alleged that $40,000 of these coupons had been received by Rust from his predecessor in office ; that he had abstracted packages of coupons from the treasurer's office after his term of office had expired ; and that in these packages were, there was reason to believe, coupons to the amount of $51,000, the property of the state. It further alleged that Rust had recently deposited the coupons thus obtained, " and other large sums," with the defendant the People's Bank, of which defendant Ogden was president or one of the stockholders.

The injunction ordered on the filing of the bill was issued

on the same day, 18th of July, 1871, directed to all the defendants, and enjoined " the said James G. Ogden and the People's Bank, and all others their servants or agents, as well as all the first above-named parties (the other defendants), James E. Rust and others, from in any manner disposing of, issuing, or putting in circulation any of the coupons or sums of money deposited by said James E. Rust with said James G. Ogden, or the People's Bank, as an indemnity or security for said Rust, or otherwise, or with any other of the above-named parties." This injunction was served upon Charles T. Wing, cashier of the People's Bank, " in the absence of James G. Ogden, president," and on some of the other defendants, on the 19th of July, 1871 ; on Ogden on the 26th of July, 1871 ; on Rust himself on the 1st of August, 1871 ; and on the other defendants, except Henry and W. S. Waters, not found, at various times up to the 1st of September, 1871.

Rust and Ogden, with a view to purge themselves of the contempt charged, have each filed affidavits in relation to the alleged violation of the injunction. There have also been filed the affidavits of E. B. McClanahan, solicitor of Rust, G. P. Thruston, solicitor of some of the sureties of Rust, and Jessie G. Wallace, the solicitor of the state.

Ogden says, in his affidavit, that " Rust deposited said coupons with me in a small tin box, with some other assets in Tennessee money, etc. He deposited said coupons for the benefit of himself and sureties, as treasurer." Ogden admits that while the box was in his control the sum of $13,270 was taken out, with his consent, and used in the payment of the purchase money due on a tract of land, which tract of land, with other property, Rust conveyed in trust to secure his official sureties. His recollection is that this sum was taken out before the injunction issued, and he refers to a receipt or statement of Rust, left in the box, showing the amount and when taken out, the date of which, it appears from a supplemental affidavit, is the 10th of June, 1871. All other sums were taken out without his

knowledge or approbation. He left the box in the vaults of the bank when it suspended, and supposes it went into the hands of the trustee. His only excuse for consenting to the first withdrawal of coupons is that he "was made satisfied it was not only to the interest of the sureties of Rust, but no less in the interest of the state—land being always counted a safe investment, and the land in question being first-class."

Rust, in his affidavit, admits that coupons were taken out of the box by his order, as follows:

First, after the tender of the coupons, there was taken out by his order, and placed in the hands of Col. McClanahan (his solicitor)..........................$ 8,000

Second........................$13,300
Third.........................   9,000
Fourth........................   4,000
                             ———— 26,300
                                  ———— $34,300

The last three withdrawals were used to pay the purchase money of the tract of land mentioned above, or to pay taxes thereon. The excuse given by him for the violation of the injunction is this: "And respondent was informed one of the attorneys for the state approved the taking of the coupons to pay for the land. Respondent believed this was all right, and in the interest of the state, and approved of by its attorney."

Rust does not say that any one of these withdrawals was made before the filing of the bill. "The receipt or statement," which Ogden says was left in the box, and on the faith of which he bases his recollection of the withdrawal of the $13,270, is produced for the inspection of the court. It consists of two separate writings, signed by Rust, on the same sheet of letter-paper, one, dated the 10th of June, 1871, acknowledging that he has withdrawn from the box $6,870 and $6,400, total, $13,270, in Tennessee past-due coupons; the other, dated 4th April, 1872, stating that, at the request of Ogden, he had on that day executed to him,

as trustee for his bondsmen, a deed of trust conveying property therein described, and had deposited with Ogden, for the same purpose, a due-bill of S. J. Little. The wording of these papers is strongly persuasive that they were penned at the same time, and, of course, at or after the date of the one of the latest date. Both memoranda were obviously, moreover, made with the same pen and the same ink, which is still further persuasive in favor of the later date.

But all doubts on this point are removed by the affidavit of Col. McClanahan, Rust's solicitor, who states that he was employed as counsel by Rust *after the bill was filed,* and Rust, to secure his fees, paid him the $8,000 first withdrawn from the box. He thinks this payment was in eight past-due Tennessee bonds. He had not then, he says, seen the injunction, but remembers well that he took the bill and read it very particularly, to see if the bonds were comprehended by the language used. Thinking they were not, he accepted them to secure his fee. There is probably no doubt as to the correctness of the affiant's recollection of the date of payment, although, it must be admitted, he is not sustained by Rust's recollection as to the form of the payment made to him. The latter, both in his answer to the bill and in his affidavit, seems to concede that the whole of the $61,398.21 were in coupons. This discrepancy is unfortunate, as the only excuse of the solicitor for being a party to a violation of the injunction is that he thought the bonds, although undoubtedly a part of the contents of the box, were not literally embraced in the wording of the bill.

Gen. Thruston was made trustee of the People's Bank in September, 1872, and found the box, among other special deposits, in the vault of the bank. He admits that the two withdrawals of $9,000, about December, 1872, or July, 1873, and $4,000, about June, 1873, were made with his knowledge. His excuse is this: " I was not a party to the suit, and if I had at any time learned that any one had been enjoined, in connection with the box or coupons, it had entirely escaped my mind."

The affidavit of Judge Wallace is to the effect that he was induced to suspend active proceedings to secure the delivery of these coupons by the repeated assurances of the counsel of Rust that the box was under the control of the sureties, and that Rust should not be allowed access to it. He admits that this counsel did inform him, at one time, that they, Rust and sureties, had used about $7,000 of the coupons in making a payment on the land. He thinks, though in this he may be mistaken, that it was stated to be the last payment, and that it secured a tract of land worth $20,000 to the sureties and the state, which would otherwise be lost. Supposing that this was all that had been used, and that it relieved such a large amount of property, " he made some such remark as that, under the circumstances, it was perhaps well that they were used in that way."

Judge Wallace dates this conversation in the summer or fall of 1873, but admits that Rust's counsel thought it was in April, 1873; Gen. Thruston's recollection of what the counsel said to him in relation to the assent of the state's attorney to the withdrawal of the coupons is in favor of the latter date.

It appears from the affidavits that the land, for the payment of which the violations of the injunction were made, consists of 220 acres on the Lebanon turnpike, which cost Rust $14,350, and on which he had spent in improvements $6,000. The land was subject to the lien of the vendor, who was enforcing it under decree of the supreme court. This land, with a house and lot in Nashville, worth $3,000 or $4,000, and an undivided half of a 3,000-acre tract in Cheatham county, was conveyed in trust to secure Rust's sureties.

It is too clear for argument, and has not been controverted by Rust's counsel, that the injunction has been, by the acts referred to, repeatedly violated. It was urged that the breach was technical—not substantial—inasmuch as the funds were used in paying for the land conveyed in trust to secure the very debt on which the suit is based, and because

the solicitor for the state had approved the use of some of the coupons for the purpose mentioned. But it must be obvious, upon a moment's reflection, that these facts go only in mitigation of the offence. The violation was direct, glaring, and repeated. The withdrawal of the first $8,000 was without any excuse whatever, if, as tacitly conceded by Rust, and expressly admitted by his solicitor, it was made after the filing of the bill and notice of the injunction. The injunction was in fact served upon Ogden on the 26th of July, and on Rust on the 1st of August, 1871, but neither of them denies knowledge of its existence at the time the acts complained of were committed. All of them were probably, and most of them certainly, after actual service.

Ogden is, as we have seen, mistaken in supposing that the withdrawal of coupons made with his knowledge occurred before the filing of the bill. The excuse of Rust could, under the proof, certainly not apply to the first withdrawals made by his order, and would, in any view, only mitigate the punishment, not condone the offence. I am compelled to hold that both defendants have been guilty of "wilful disobedience to the lawful process" of this court.

It is unnecessary for me to dwell upon the importance of the judicial department of the government to the prosperity of the state, and the necessity of sustaining its authority. These are elementary principles universally conceded. Its power for good would be at an end if its orders should cease to be respected, and its mandates disobeyed with impunity. It must carefully and zealously guard its domain, not merely for its own preservation, but for the benefit of the whole commonwealth. The power to punish for contempts is absolutely essential to the protection and existence of courts. It existed at common law, and has been declared by statute. The Code, § 4106, subsec. 3, expressly concedes the power of the several courts of this state to issue attachments and inflict punishment for contempt of court, for the wilful disobedience of any party,

or other person, "to the lawful writ, process, order, rule, decree, or command of the court."

But the Code limits the punishment which this court may inflict, by § 4107, to a fine of $50, and imprisonment not exceeding ten days. The next two sections are:

Sec. 4108. "But if the contempt consists in an omission to perform an act which it is yet in the power of the person to perform, he may be imprisoned until he performs it."

Sec. 4109. "If it consist in the performance of a forbidden act, the person may be imprisoned until the act is rectified by placing matters and persons in *statu quo*, or by the payment of damages."

Ordinarily the power is restricted within the limits of § 4107, though, under circumstances, it may go to the extent authorized by the sections following.

It has been urged in this case, by the solicitor of the state, that the present offence falls within § 4109, and this view was not controverted by the learned counsel of the defendants. But, if this be conceded, it by no means follows that the power should be exercised in a case like the present, where the extent of the ultimate injury does not appear, and cannot, in the nature of things, be shown until the final hearing. The coupons taken have been converted by persons not now sought to be reached or punished. There is a reasonable doubt that §§ 4108 and 4109 were only intended to be exercised when final decrees have been violated, or, at any rate, only after the rights of the parties are determined, and upon final hearing. Besides, § 4108 is limited by the express proviso that it "is yet in the power of the persons to perform" the act ordered. And it can scarcely be insisted that § 4109 is not subject to the same limitations. The rule in such cases is that disability will excuse, unless the party has voluntarily and contumaciously disabled himself. *Myers* v. *Trimble*, 3 E. D. Smith, 612 ; *Galland* v. *Galland*, 44 Cal. 475 ; *Ex parte Cohen*, 6 Cal. 318.

Without undertaking, at this time, to decide that these

sections only apply to final orders and decrees made upon an adjudication of the rights of the parties, or to punishment for contempt after final hearing, I can safely say that it would never do, in the attitude in which this case stands, to exercise the extreme power conceded by § 4109 upon these defendants. For, in the first place, it is not shown, and cannot be until final hearing, what damages have been sustained by the acts done; nor is it shown that it is in the power of the defendants to place matters in *statu quo*, or pay the damages sustained; and, therefore, to make, at this time, the order asked would be without proper warrant, and unreasonably harsh, for it might amount to imprisonment for life. *Lansing* v. *Easton*, 7 Paige, 367. In the second place, the record does show, *prima facie*, that the damage to the state is very little, if anything, even upon the supposition that the coupons were the property of the state. The greater part of the coupons taken were invested in the land mentioned, and this land has been conveyed by Rust in trust for his official sureties, a trust, which, I presume, will enure to the benefit of the state. The coupons otherwise disposed of are, perhaps, fully made up by the other property included in the trust deed. And, if there is any doubt of the right of the state to take the benefit of the trust deed, that right may, doubtless, be made certain by decree following the coupons, and by agreement of parties.

Under these circumstances my opinion is that my power of punishment, in this case, is limited at present to the express terms of § 4107. The attachment need not, however, be discharged until the case is ready for final action upon it.

In this view I submit to the learned counsel for the state whether it is worth his while to insist upon the exercise of this power at present. Undoubtedly it is my duty to inflict the punishment, if it is insisted upon, and I shall not hesitate to do it. Neither he, however, nor the court, can overlook the fact that the violations in this case have been committed under strong temptations to save property in

danger of being sacrificed, and assigned to secure the demand sued for; that they were sanctioned by some of the sureties, who had every interest to see that the state was not injured, or the fund imperriled, and that they were winked at (not to put too fine a point upon it) by two of the solicitors of this court, who are not sought to be punished. Under these circumstances I turn these defendants over to his tender mercy, and will suspend the judgment until he shall have taken time to consider, and submit his wishes.